FILED'09 JUN 25 14:11 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR 08-289-1-JO |
| | ) | |
| v. | ) | FINDINGS OF FACT, |
| | ) | CONCLUSIONS OF LAW |
| KENNETH R. FREEMAN, | ) | AND ORDER TO SHOW CAUSE |
| | ) | |
| Defendant. | ) | |

Kemp L. Strickland
UNITED STATES ATTORNEY'S OFFICE
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204

  Of Attorneys for United States of America

Ellen C. Pitcher
OFFICE OF THE FEDERAL PUBLIC DEFENDER
101 S.W. Main Street, Suite 1700
Portland, OR 97204

  Attorney for Defendant

JONES, Judge:

Defendant Kenneth Ray Freeman has been charged in Count One with receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2)(A) and (b)(1), and in Count Two with possession of child pornography in violation of 18 U.S.C. § 2252(a)(5)(B). Currently before the court are defendant's Motion to Suppress Evidence and Statements (#14). For the reasons set forth below, defendant's motion is granted.

## DISCUSSION

On June 16, 2009, this court held an evidentiary hearing to resolve the issue of whether Freeman consented to the warrantless search of his residence, a mobile home located at 1370 E. Highway 730, Irrigon, Oregon, on November 29, 2006. During the search, three federal agents from Department of Homeland Security, Immigration and Customs Enforcement ("ICE") interviewed Freeman, obtained incriminating statements from him, and seized three computers from the residence that were later found to contain incriminating images. If the ICE agents' warrantless entry into Freeman's residence and the ensuing search and seizure violated the Fourth Amendment, then all evidence acquired as a result of that entry is inadmissible and must be suppressed. *See* Wong Sun v. United States, 371 U.S. 471, 484-86 (1963); United States v. Shaibu, 920 F.2d 1423, 1428 (9th Cir. 1990).

The law regarding a warrantless search of a residence is well-established: Whether the search or seizure involves persons or property, "the Fourth Amendment has drawn a firm line at the entrance to the house." Payton v. New York, 445 U.S. 573, 589-90 (1980). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505,

2 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

511 (1961). "A warrantless search of a house is per se unreasonable." Payton, 445 U.S. at 586. "Absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment." Steagald v. United States, 451 U.S. 204, 211 (1981); Schaibu, 912 F.2d at 1425.

In this case, the government admits that the ICE agents did not have a search warrant, and that there were no exceptional circumstances that compelled the agents to enter Freeman's residence. Rather, the lead investigator, Senior Special Agent Findley, testified that based on information he had received from a larger federal investigation into a child pornography distribution operation in New Jersey, which implicated Freeman as a subscriber to one of three child pornography websites, he and two other ICE agents came to Freeman's property in plain clothes to conduct an informal "knock and talk" interview on the evening of November 29, 2006. The government relies entirely on Freeman's consent to establish the legality of the agents' entry into Freeman's mobile home, the subsequent search, and the seizure of three computers.[1] The law is well-established that "the government 'always bears the burden of proof to establish the existence of effective consent.'" Shaibu, 920 F.2d at 1426 (quoting United States v. Impink, 728 F.2d 1228, 1232 (9th Cir. 1984)) (additional citations omitted).

"Judicial concern to protect the sanctity of the home is so elevated that free and voluntary consent cannot be found by a showing of mere acquiescence to a claim of lawful authority." Id.

---

[1] On June 26, 2008, it is undisputed that federal law enforcement agents returned to Freeman's residence with an arrest warrant that was obtained based on a grand jury indictment charging him with the receipt and possession of child pornography. After the agents entered the residence and placed Freeman under arrest, he agreed to speak with the agents, was read Miranda warnings, signed a written waiver of those rights, and signed a written consent form to permit agents to search his residence. As a result of this search, a computer and other electronic media used to store images were seized, and Freeman made inculpatory statements to the arresting agents.

3 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

(citing Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)). Therefore, in a case such as this one, where Freeman disputes the consensual nature of the entry and claims that he did not invite the three ICE agents into his mobile home, while all three ICE agents claim that Freeman "allowed" them to enter his mobile home after they spoke with him outside for a few minutes, the government must establish the following:

> It must show that there was no duress or coercion, express or implied. The consent must be "unequivocal and specific" and "freely and intelligently given." There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. "'Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights." Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact.

United States v. Page, 302 F.2d 81, 83-84 (9th Cir. 1962) (citations and footnotes omitted). "The government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry." Shaibu, 920 F.2d at 1427. Whether a defendant's consent is voluntary is determined from the totality of the circumstances, Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973), and in this case, the government must demonstrate that the ICE agents' "knock and talk" practice reflects the defendant's voluntary consent to the search. See id. at 222.

## CREDIBILITY ASSESSMENT

In the absence of any contemporaneously written reports by federal law enforcement agents documenting the events that occurred at the front door of Freeman's mobile home on November 29, 2006, or detailing the means by which the agents obtained Freeman's consent to enter the residence, conduct a search, and seize Freeman's computers, the court must necessarily weigh the credibility of the testimony provided by the three ICE agents who were present for the

4 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

"knock and talk," against Freeman's conflicting testimony on the issue of whether Freeman gave sufficient consent to permit agents to lawfully advance from the front porch of the mobile home, through the doorway behind Freeman, and into the residence where the search and seizure ensued. As of the date of the suppression hearing, each witness is relying on a recollection of events that occurred more than two and a half years ago, with very little corroborating evidence in the record.

For the reasons set forth below, I find Freeman's account of the events that transpired on November 29, 2006, to be the most credible, and therefore rely on his testimony to resolve any disputes of fact and to make my findings in this case. For Freeman, what occurred that night was one traumatic event, which he described with detail, clarity, and consistency. In contrast, the three ICE agents—who each testified that in the course of his law enforcement career had conducted between fifty and one hundred "knock and talk" investigations—lacked detail and suffered from a number of inconsistencies in several important respects. I find that the three agents' conflicting portrayals of what occurred that night at Freeman's home lack credibility, and that the methods used to obtain information from Freeman are highly suspect.

First, the ICE agents chose a dark, freezing cold night in an isolated Eastern Oregon location to conduct their mission. Why didn't they go across the street from their offices to the United States Courthouse in Portland to obtain a search warrant from a designated U.S. Magistrate Judge who is on duty twenty-four hours a day? The lead investigator, Agent Findley, admitted that their mission was not urgent. The agents testified that they had enough basic facts to link Freeman to a larger federal child pornography investigation, and should have applied for a

5 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

search warrant; yet, they chose this dubious "knock and talk" method to gain access to Freeman's home and seize his computers.

Second, why choose 9:00 p.m. in the dark of night to knock loudly and repeatedly at Freeman's door to "talk" to him? Absolutely no reason was given to explain why they could not have visited Freeman's property during daylight hours.

Third, when Freeman admittedly told the agents from inside his residence that he did not want to talk to them because he was just awakened, was tired, didn't feel well, and offered to talk to them the next day, why didn't they depart without further discussion? Freeman testified, unequivocally: "Once before the door opened and twice out there [on the porch], I asked them to leave; [told them] that I wasn't feeling well; that I needed my sleep and would they please come back and talk to me when I was in a better condition to talk to them." (Tr. at 119-20.) The agents should have left and returned at a more reasonable time. No explanation was provided to justify the agents' continued presence at Freeman's front door.

Fourth, once inside, the agents asked Freeman many incriminating questions, without any Miranda warnings; although they told Freeman that they were not there to arrest him that evening, and portrayed the conversation as a casual, informal, question-and-answer session, Freeman was not actually in a position to freely disengage from the interrogation or to leave the premises. These agents told Freeman that he was not under arrest even after informing him that they had all of his internet "screen names" and had corroborating financial information to use against him; yet, as he was soon to find out, Freeman certainly was not free to leave or even to move about in his own home. Freeman testified: "I felt at that point that I was . . . going to be

6 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

arrested; that I had no choice in whatever happened after that point. I was scared. I was cold. I was tired." (Tr. at 121.) When Freeman got up from his recliner chair in the living room, left to use the restroom for a few minutes, and then went into the mobile home's back bedroom to rest and put on a shirt and shoes, the agents began yelling at him to come out from behind the closed door with his hands up. Each agent admitted to pulling out his weapon at this time. When Freeman opened the door, he saw all three agents out in the hallway, in defensive positions, with their hands on their weapons. None of three agents' testimony was consistent regarding Freeman's exit from the living room, or regarding how the events unfolded that led them to Freeman's back bedroom, where two additional computers were seized. At this point, the "knock and talk" was clearly a sham.

Fifth, the three ICE agents each gave inconsistent versions of how the two computers from Freeman's back bedroom were obtained. One agent said that Freeman voluntarily retrieved the computers himself, and just re-appeared in the hallway carrying both computers. Given that one of the computers was a bulky "tower" style, and the other was a laptop, and given that Freeman was an overweight fifty-seven year old in poor physical condition, who was suffering from lower back problems, I find this account to be completely implausible. Another agent testified that Freeman carried one computer, and an agent carried the other. One agent testified that he looked into the bedroom and saw Freeman unhooking the tower computer, and another testified that an agent unhooked that computer. Finally, after changing his story three times, the agent in charge eventually admitted that he had no personal knowledge about exactly how the computers were obtained and was just relying on what the other agents had told him. Freeman testified truthfully that he did not intend to permit the agents to enter his bedroom; they just

7 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

walked through the door, saw the tower computer and unhooked it, saw the laptop under the bed and took it, and at no point did they ever permit him to touch either computer. Finally, Freeman testified that the agents escorted him back down the hallway, with the computers in their possession. I find Freeman's account of the incidents that occurred in his back bedroom to be fully credible.

Sixth, the ICE agents' actions on November 29, 2006, were not then, and never have been properly reported. There was no report made at or near the time of the event; more than a month later, the lead agent simply concocted a vague and cursory notation. There was never a notation in any agent's report recounting the details of any consent Freeman gave at any point–from the entry into the mobile home, to the seizure of the first computer in Freeman's living room, to the entry and seizure of the two additional computers from Freeman's back bedroom. Further, as mentioned above, although each agent agreed during the motion to suppress hearing that weapons were drawn while inside Freeman's home, there was no record made of this significant event.

Finally, nearly a year and seven months passed before any legal action was taken against Freeman, when law enforcement agents–including the ICE agents who participated in the "knock and talk"–arrived to execute an arrest warrant.

From all of the above, I conclude that the three ICE agents' actions were the very anthesis of proper law enforcement practices and should not be condoned.

/ / /

/ / /

/ / /

8 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

## **FINDINGS OF FACT**

Based on the record in this case, considering the totality of the circumstances, and having concluded that defendant Freeman's version of the events is credible, I make the following findings of fact:

1. On November 29, 2006, when ICE agents Josh Findley, Jim Cole, and Sam Clawer arrived in an unmarked sport utility vehicle at Kenneth Freeman's mobile home in Irrigon, Oregon, it was approximately 9:00 p.m., and the temperature outside was roughly 20 degrees Fahrenheit. The agents were dressed in plain clothing, which included jackets and sweatshirts appropriate for the weather, when they knocked on Freeman's door.

2. Freeman had returned from a vacation in Mexico the day before, and was asleep in the bedroom at the rear of the mobile home when he was awakened by the agents' insistent knocking at his door. Freeman was suffering from a number of health conditions, most notably disc problems in his lower back, for which he had been taking pain medication. Freeman, who was wearing only his underwear when he was awakened, quickly put on his pants and socks and came to the front door. Upon learning the ICE agents' identity, Freeman refused to open the door, telling the agents to go away and come back the next day because he was tired, didn't feel well, and was not in a condition to talk to them that night.

3. The ICE agents did not leave the premises, and continued to speak to Freeman through the closed door. Hoping to convince the agents to leave by speaking with them face-to-face, Freeman stepped out onto his front porch, closed the door behind him, and spoke with the agents outside on the porch for approximately five minutes. During the conversation, Freeman emphatically told the agents that they could not come into his home, that he wanted them to go away, and that he would talk to them the next day. He told the agents he had already gone to bed, he was fatigued, he needed to sleep, and he did not want to talk to them at that time. While all four men were standing outside on the small front porch, the agents showed Freeman their law enforcement credentials, explained that Freeman's name had come up in an investigation of internet websites known to contain child pornography, and informed Freeman that they were not there to arrest him but only to discuss his involvement in the website investigation.[2] Freeman was skeptical and told them that he did not want to talk about it, but he also did not want to do anything that would lead to further problems.

4. Agent Findley commented that it was cold and asked Freeman if he would rather talk inside. The agents, who were fully clothed, would not leave Freeman's front porch despite Freeman's repeated requests for them to go away. Meanwhile, Freeman was standing outside in the 20-degree weather, clothed only in an underwear T-shirt, a pair of pants, and

---

[2]Freeman testified that while he was outside on the front porch there was some general discussion about a child pornography investigation; however, there was no specific discussion about the actual evidence the ICE agents had against him. "All of the questions and them telling me what they had as far as a case against me and everything happened once we got inside the trailer." (Tr. at 120.)

10 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

still in his socks without any shoes. After enduring more than five minutes of persuasion by the agents, Freeman said, "I'm too cold to stand out here and argue with you. I'm going inside." (Tr. at 120.) Freeman turned around and opened the door far enough to permit him to retreat into the warmth of his residence. His testimony about how the agents gained entry speaks for itself: "One of the officers reached over my shoulder, opened the door fully, and basically three men escorted me into my home." Id. I find that none of the ICE agents were expressly or impliedly invited to come into the residence to continue their mission. I further find that Freeman never gave consent, either express or implied, to permit the agents to enter his residence.

5. Once inside, Freeman did not ask the ICE agents to leave again, having already asked them to leave at least three times before, to no avail. Freeman was scared, cold, and tired. Despite the agents' assurances, Freeman still thought that he would be arrested, and the agents kept questioning him persistently. Freeman was not at liberty to freely move about his home. Rather than resist further, Freeman began answering the agents' questions, made incriminating statements, and eventually acquiesced to the agents' seizure of one computer from his living room, and two computers from his bedroom.

6. While inside the residence, Agent Findley filled out a "Consent to Search" form dated 11/29/06, which Freeman signed, authorizing law enforcement agents to search Freeman's computers (*see* Government Exh. 2); Findley also filled out a "Custody Receipt for Seized Property and Evidence" form dated 11/29/06, which Freeman also signed (*see* Government

11 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

Exh. 3). Agent Cole wrote down a few informal notes while Freeman was being interviewed inside the residence, but these notes do not discuss the events that led up to the agents' entry into the mobile home, or otherwise document the details of Freeman's discussion with agents outside on the front porch.

7. None of the ICE agents wrote a report or made any entry by dictation or otherwise to document the events that occurred at the Freeman residence until more than a month later; the cursory report did not contain a single word as to how the agents obtained consent to enter and search Freeman's residence. To this day, no ICE agent has written anything in any report about receiving Freeman's consent to enter; in a report dated March 12, 2009, prepared in anticipation of the evidentiary hearing, the author notes only that "Freeman allowed agents into his residence."

## CONCLUSIONS OF LAW

The government has not met its burden to show that Freeman gave "unequivocal and specific" consent to permit ICE agents to enter his residence on November 29, 2006. The circumstances of this case closely resemble the scenario in Shaibu, where the defendant walked out of his apartment, left the door open, and during questioning by law enforcement officers, the defendant turned around and walked back through the door; the officers simply followed without any clear exchange of words seeking and granting permission to enter and search. Shaibu, 920 F.2d at 1424. The Ninth Circuit held as a matter of law that such conduct, standing alone, is insufficient to constitute consent to an entry by law enforcement officers. Id. at 1425.

12 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

Not only did Freeman take additional steps to prevent the ICE agents from entering his mobile home by unequivocally telling them to leave even before he opened the door, but also he took care to close the door when he stepped outside to respond to the agents' inquiry, where he again told the agents to leave. After the ICE agents showed their badges, and continued to discuss Freeman's involvement with a child pornography website while Freeman remained on his front porch, at night, in sub-freezing weather, clad in barely more than his underwear, the agents crossed the line from a casual "knock and talk" to set up a situation where Freeman was compelled to retreat into his residence because they would not leave him alone; he simply opened his front door, and all three agents–without his permission–followed him inside. Following that unlawful entry, Freeman submitted to their authority and was coerced into allowing the agents to remain inside, where they continued to question him, conducted a further search of his residence, and ultimately seized three computers. "[The] standard in this Circuit [is] that '[c]oercion is implicit in situations where consent is obtained under color of the badge.'" Id. at 1427 (quoting Page, 302 F.2d at 84.) The law is unequivocal on this point: "Where there is coercion there cannot be consent." Bumper v. North Carolina, 391 U.S. 543, 550 (1968).

Here, as discussed above in the findings of fact, there simply was no consent to permit the agents to enter Freeman's residence, and thereafter any consent Freeman gave to permit the agents to search further was certainly coerced. In sum, there was no "clear and positive testimony" that any of the three ICE agents obtained permission to follow Freeman into his residence, let alone "convincing evidence" that defendant waived his right to be free from unreasonable searches and seizures under the Fourth Amendment and thereby "freely and intelligently" consented to the ICE agents' entry into his residence. *See* Page, 302 F.2d at 83-84; Shaibu, 920 F.2d at 1426.

13 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

I conclude as a matter of law that the ICE agents' initial entry into Freeman's residence violated the Fourth Amendment. Thus, the remainder of the search and seizure that occurred on November 29, 2006, was unlawful. The "Consent to Search" form and "Custody Receipt for Seized Property and Evidence" Freeman signed that night are of no legal effect; "[a]ll evidence acquired after the entry must . . . be suppressed." Shaibu, 920 F.2d at 1428 (citing Wong Sun, 371 U.S. at 484-86; Weeks v. United States, 232 U.S. 383 (1914)). Furthermore, all statements Freeman made to agents while inside his residence on November 29, 2006, and all information obtained from the computers seized on that date are "fruit of the poisonous tree" and cannot be used by the government. See Wong Sun, 371 U.S. at 484-86. Finally, because the evidence that was unlawfully acquired from the November 29, 2006, search and seizure was later used to obtain the arrest warrant served on Freeman on June 26, 2008, all of the evidence acquired subsequent to the service of that warrant is tainted and must also be suppressed. See id.

## DISPOSITION

Defendant's Motion to Suppress Evidence and Statements (#14) is GRANTED IN FULL. The government conceded at the start of the evidentiary hearing that it would not have sufficient evidence to proceed to trial if the court suppressed the evidence obtained from Freeman both during the November 29, 2006, encounter and any encounters thereafter. I initially was inclined to dismiss the indictment in this case based on defendant's motion to summarily dismiss the indictment on these grounds. (See Motion to Dismiss (#30).) As Justice Cardozo famously said in reference to the exclusionary doctrine, "'[t]he criminal is to go free because the constable has blundered.'" Mapp v. Ohio, 367 U.S. 643, 659 (1961), quoting People v. Defore, 150 N.E. 585, 587 (N.Y. 1926)). If so, "it is the law that sets him free. . . . [n]othing can destroy a government

14 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE

more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." Mapp, 367 U.S. at 659.

The government objects to a summary dismissal of the indictment in this case, and requests further review. Accordingly, the government shall have until July 1, 2009, to advise the court if any evidence remains to be used in its proceeding against the defendant in light of this ruling, and to show cause as to why the indictment should not be dismissed. Until the final order of dismissal is entered by this court, Freeman's conditions of pretrial release must remain intact.

IT IS SO ORDERED.

DATED this 24th day of June, 2009.

ROBERT E. JONES
U.S. District Judge

15 - FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER TO SHOW CAUSE